QUINTEL CORPORATION,
N.V., Plaintiff,

v.

CITIBANK, N.A., Defendant.

CITIBANK, N.A., Third-Party Plaintiff,

v.

H.R. GAJRIA, Arnold Alperstein, and Goldstick, Weinberg, Feldman, Alperstein & Taishoff, P.C., Third-Party Defendants.

QUINTEL CORPORATION, N.V., and H.R. Gajria, Plaintiff,

v.

Arnold S. ALPERSTEIN, et al., Defendants.

Nos. 80 Civ. 4936(RWS), 82 Civ. 4856(RWS).

United States District Court, S.D. New York.

Feb. 22, 1985.

902

Carro, Spanbock, Fass, Geller, Kaster & Cuiffo, New York City, for plaintiff and third-party defendant; Kenneth A. Lapatine, Jeffrey K. Cymblar, New York City, of counsel.

Sherman & Sterling, New York City, for defendant and third-party plaintiff; Mark P. Zimmett, Catherine Gallo, Joseph F. Haggerty, New York City, of counsel.

Wilson, Elser, Edelman & Dicker, New York City, for defendants and third-party defendants; Edward J. Boyle, Steven Kent, New York City, of counsel.

## OPINION

SWEET, District Judge.

These consolidated actions were tried before a jury between November 5–16, 1984, and on November 16 the jury rendered its verdict for plaintiffs Quintel Corporation, N.V. and H.R. Gajria ("Gajria") (collectively, "Quintel"). Defendant and third-party plaintiff Citibank, N.A. ("Citibank") has now moved this court pursuant to Fed.R. Civ.P. 50(b) to overturn the jury verdict or, in the alternative, for a new trial pursuant to Fed.R.Civ.P. 59. Defendants Arnold S. Alperstein and Goldstick, Weinberger, Feldman, Alperstein & Taishoff, P.C. (collectively, "Alperstein") have cross-moved for judgment notwithstanding the verdict. Quintel has moved for the inclusion of prejudgment interest in the judgment against Citibank and Alperstein. Citibank also seeks prejudgment interest on its cross-claim. For the following reasons, Citibank and Alperstein's motions for judgment n.o.v. and for a new trial are denied and Quintel and Citibank's motion for prejudgment interest are granted in part and denied in part.

**The Facts as Established at Trial**

These actions arose out of real estate transaction in which plaintiff and third-party defendant H.R. Gajria acquired the limited partnership interest in Flag Associates, L.P. ("Flag"), a partnership to be formed for the purpose of acquiring, operating and converting to condominium ownership six apartment complexes located in the State of Florida (the "Developed Land"). Gajria is a non-resident of the United States who is engaged in the business of manufacturing and distributing watches and electronic equipment principally in Japan and the Mid-

dle East. Quintel is a corporation existing and organized pursuant to the laws of the Netherlands Antilles which was organized as an acquisition vehicle for the transaction. Citibank is a nationally chartered bank which acted as investment advisor and fiduciary agent to Quintel and Gajria in connection with the investment effectuated by Gajria's acquisition of all stock in Quintel and Quintel's acquisition of the limited partnership interest in Flag. Alperstein is an attorney engaged in the practice of law in the State of New York who was engaged by Gajria to represent him in the negotiation and the completion of the Flag investment.

In 1979, Monumental Properties Trust ("MPT") retained Brooks, Harvey & Co. ("Brooks Harvey") to manage the sale of its real estate holdings throughout the United States. One package of real estate consisted of MPT's real estate holdings in Florida (the "Florida Package"). In connection with the sale of the Florida Package, Brooks Harvey prepared and circulated a brochure (the "Blue Book") to prospective purchasers that described the package as including both the Developed Land, consisting of six garden apartment complexes, and approximately 80 acres of undeveloped land (the "Undeveloped Land"). The offering price for the Florida Package was $13.5 above existing mortgages, of which $1.486 million was attributed to the value of the Undeveloped Land.

In May 1979, MPT entered into a purchase agreement (the "Purchase Agreement") with Garrin Properties, Inc. ("Garrin"), an entity wholly owned by Nelson Rising ("Rising"), Robert Ginsberg ("Ginsberg") and John Rudey ("Rudey") (collectively, the "General Partners"), in which Garrin agreed to buy the Florida Package for a purchase price of $11.5 million in excess of existing mortgages. Garrin then approached Citibank's Gary Bulkley ("Bulkley"), a vice-president in the Bank's Real Estate Investment and Management Department, to obtain second mortgage financing. After obtaining second mortgage financing elsewhere Garrin returned to Citibank to obtain help in finding an investor who could supply equity financing to cover the balance needed. Although Garrin and Citibank initially discussed giving an investor a 25–30% interest in the entire Florida Package in exchange for $4,800,000, they ultimately negotiated a proposal eliminating the Undeveloped Land from the Florida Package and providing that the equity investor would receive a 49% interest in the Developed Property in exchange for $4.1 million. Garrin agreed to contribute $700,-000 of its own funds towards the purchase of the Florida Package. On June 27, 1979, Garrin and Citibank set up Flag as a limited partnership in accordance with their negotiations. Citibank subsequently prepared a brochure (the "Red Brochure") which described the investment available in Flag for an equity investor. The Red Brochure did not mention the Undeveloped Land.

Gajria, who had been a Citibank client since July 1978, first became involved in the Flag transaction in August, 1979 when he was given a copy of the Red Brochure by Rusi Sanjani ("Sanjani") who had previously pursued other interests on Gajria's behalf. At that time, Gajria, through Sanjani, also contacted Alperstein for advice in connection with the proposed acquisition by Gajria of the limited partnership interest in Flag. Alperstein was also given a copy of the Red Brochure.

Gajria first met with representatives of Citibank on August 6, 1979 after Sanjani on Gajria's behalf had engaged in preliminary discussions with Citibank about the investment. Gajria also met with Alperstein on August 6 to discuss the investment. On August 7, Gajria flew to Florida to inspect the properties with Sanjani, his son, Kaizad Sanjani ("Kaizad"), Gary Bulkley, and Claude Kemper of Citibank ("Kemper"). At trial, Gajria and the Sanjanis testified that during the flight down to Florida and on three other occasions Gajria and the Sanjanis questioned the Citibank representatives as to why Quintel would receive only a 49% interest in Flag for a $4.1 million investment whereas the Gener-

al Partners were receiving a 51% interest for their $700,000 commitment.

Gajria and the others were met in Florida by Rising, who accompanied them on their site inspections. During the visit, Rising discussed the history of the negotiations between MPT and Garrin which culminated in the Purchase Agreement, but the Purchase Agreement was never shown to Gajria or the Sanjanis, nor were they informed of the existence of the Undeveloped Land. At one point during the visit, Kaizad pointed to the Undeveloped Land and asked Rising if it was "ours." Rising responded by saying "No." Neither Bulkley or Kemper responded. Gajria also testified at trial that Rising was asked to identify all other Florida properties in which the General Partners had an interest, and that neither Rising nor the others mentioned the Undeveloped Land in response to this query. During the course of the inspection trip, Gajria and the Sanjanis saw Rising refer to the Blue Brochure for information about the properties. None of them were ever shown the Blue Brochure. There was no testimony presented that they requested to see the Blue Brochure.

On August 8, in New York, Gajria agreed orally to take the entire investment. He arranged to borrow $4.8 million from Citibank to cover both the $4.1 million investment and Citibank's $600,000 advisory fee. He subsequently signed an Acquisition Agreement, an Acquisition Authentication and a Service Agreement. These agreements provide, among other things, for Gajria to pay Citibank the sum of $600,000 in consideration for its services in connection with the Flag investment, for Citibank to render monitoring services in connection with the operation of some of the properties, for Gajria to make his investment through Quintel, and for Gajria and Quintel to indemnify Citibank except for gross negligence or willful misconduct. Gajria also on August 8 formally retained Alperstein as his attorney for the transaction. As Gajria's attorney, Alperstein reviewed these documents as well as the Red Brochure.

From August 7 through August 10, Gajria, the Sanjanis, Alperstein, Citibank and the General Partners negotiated the terms of the Flag Limited Partnership Agreement ("Partnership Agreement") and the related business plan. During the course of the August 9, 1979 meetings, Gajria was shown a copy of a draft partnership agreement prepared by Alperstein and Paul Kalos ("Kalos"), Citibank's in-house counsel. After reading paragraph 6.03 of the Partnership Agreement, which stated that the General Partners had entered into a Purchase Agreement with MPT to purchase all the properties listed in the Purchase Agreement and that the General Partners would cause all of the assets, excluding "the property described in Exhibit A annexed hereto" to be acquired by the Limited Partnership, Gajria inquired about Exhibit A which was not attached. Kalos responded by telling Gajria that Exhibit A was not ready yet because it was still being typed.

The documents for closing were finalized on August 11 and 12 by attorneys for the General Partners. Early on August 13, Citibank and Alperstein received execution copies of the documents, including Exhibit A to the Partnership Agreement, which is a metes and bounds description of the Undeveloped Property, and Exhibit A-1, the Purchase Agreement between Garrin and MPT. Also on August 13, a conversation took place between Frederick Russo ("Russo") another Citibank attorney, who was called in to replace Kalos, and Alperstein to which Bulkley, Kemper, Gajria and the Sanjanis were witnesses. According to Russo, he had just discovered that the Undeveloped Land was not included in Gajria's investment and specifically mentioned that fact to Alperstein when he phoned him about the documents. According to Gajria, Alperstein placed the call in order to express concern on another matter and the Undeveloped Land was not discussed.

The closing took place in Baltimore on August 14, 1979, and was attended by Russo, Bulkley, the General Partners and their lawyers. Prior to the closing, Russo and Bulkley on the train trip to Baltimore ob-

tained an agreement from Ginsberg not to develop the Undeveloped Property in a manner that would compete with the Developed property. Alperstein, Gajria and the Sanjanis chose not to attend the closing. At the closing, Garrin acquired the total of the Florida Package from MPT. It then assigned the Developed Land portion to Flag and assigned the remaining Undeveloped Land, valued at approximately $1.4 million, to the General Partners affiliated limited partnership, Queens Park Land Developers ("Queens Park").

The day after the closing, Gajria requested and was given a copy of the Blue Brochure. Gajria testified that he asked for the Brochure only because he wanted to show his family pictures of the apartment complex he had just purchased which were included in the Brochure. He further testified that it was only upon reading the Blue Brochure on the way to the airport that he first discovered the existence of the Undeveloped Land. He also testified that he subsequently discovered that the purchase price to Garrin of the entire Florida Package was the same as the purchase price to Flag of just the Developed Land, and that the Undeveloped Land had been assigned to Queens Park.

After Gajria complained to Citibank, Citibank offered to replace him with another investor and to refund his money. Gajria refused, saying that he did not want to be replaced in the investment but instead wanted an interest in the Undeveloped Land. In May 1980, Gajria repaid Citibank the entire principal of the loan plus interest that Citibank originally made to him in August, 1979.

Gajria and Quintel subsequently commenced an action charging Citibank and the Flag General Partners with securities violations, common law fraud and breach of fiduciary obligation. On June 28, 1985 Gajria and Quintel settled with the General Partners and rescinded the transaction entered into with the Flag General Partners. Quintel was paid $6.2 million. A separate action charging Alperstein with legal malpractice and breach of contract was also commenced and both actions were consolidated. 100 F.R.D. 695. Citibank and Alperstein also asserted claims for contribution against each other, and Citibank asserted a claim against Quintel to recover the amount of an overdraft in one of Gajria's bank accounts at Citibank which was never repaid.

In opinions prior to trial, it was held that Gajria could not sue Citibank for less than gross negligence or willful misconduct and that the measure of damages was limited to $617,000, the total of the fees paid by Quintel to Citibank and Alperstein. 596 F.Supp. 797.

### The Standard for Judgment n.o.v. and for a New Trial

Entry of a judgment notwithstanding the verdict is only appropriate where "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970); *see also Ebker v. Tan Jay Int'l, Ltd.,* 739 F.2d 812, 825 (2d Cir.1984). The evidence must be viewed in the light most favorable to the non-movants. *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 573 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982). In making such a determination, "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & Pekin Union Railway,* 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944). For judgment n.o.v. to be entered for either Citibank or Alperstein, they must establish that the evidence presented could only have supported a conclusion contrary to the verdict reached by the jury. The jury's verdict must be affirmed if there is sufficient evidence to support the jury's reasonable findings of fact, even if a different conclusion is also possible. *See Fund of Funds, Ltd. v. Ar-*

thur Andersen & Co., 545 F.Supp. 1314, 1326 (E.D.N.Y.1982).

A new trial may be granted in the interests of justice and to prevent a miscarriage of justice where judgment n.o.v. would not be appropriate. *Isley v. Motown Record Corp.,* 69 F.R.D. 12, 16 (S.D.N.Y. 1975); *Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978). In deciding on a motion for a new trial, the court may weigh the evidence and need not view it in the light most favorable to the verdict winner. *Fund of Funds, Ltd. v. Arthur Andersen & Co., supra,* 545 F.Supp. at 1326. The court has considerable discretion in ordering a new trial if the verdict is so inconsistent with the weight of the evidence or if the errors at trial were so prejudicial that to do otherwise would be a miscarriage of justice. *Haber v. County of Nassau,* 557 F.2d 322 (2d Cir.1977).

**Citibank's Motion for Judgment n.o.v. and for a New Trial**

In order for Citibank to be granted judgment n.o.v., there must have been insufficient evidence presented at trial to support the jury's conclusions that the General Partners' acquisition of the Undeveloped Land was a material undisclosed fact, that Gajria was not put on notice of this acquisition, and that Citibank intended to deceive, manipulate or defraud Gajria or that it acted recklessly. Citibank contends that there was no evidence presented at trial that could establish all of these elements.

**Materiality**

With regard to Quintel's burden of proof on the element of materiality, the court instructed the jury as follows:

In general, information is material if a reasonable person would attach importance to it in determining how to act. The information must be such that if it were disclosed, it would be reasonably certain to have a substantial effect on an investment decision, whether the information refers to a past or future event.

In response to the special interrogatories, the jury concluded that the existence of the Undeveloped Land and the manner and cost of its acquisition by the General Partners was a material fact. The principal evidence offered by Quintel upon which the jury could have relied in reaching this conclusion was the opinion of its expert witness, Robert Stanger ("Stanger") and the testimony of Gajria himself and the testimony concerning the development of the transaction, including the events which took place on the trip to Baltimore. Citibank now argues that Stanger's opinion should be disregarded and that in any event neither his opinion nor Gajria's testimony supports the jury's conclusion.

Citibank first contends that Stanger, who testified at the trial that the Undeveloped Land was additional compensation to the General Partners in a material amount that should be disclosed, was improperly qualified as an expert. However, Stanger's knowledge of the industry standard, based upon his personal procedures and his observations of the industry, was adequately established at trial and I find that he was properly qualified as an expert witness.

Citibank also asserts that Stanger's testimony as to materiality amounted to impermissible instruction of the jury as to applicable legal requirements. Stanger's testimony, however, consisted of explaining to the jury what the industry standard is and how it would be applied to facts posed in a hypothetical. Stanger testified that based on the industry standard, the Undeveloped Land would be considered material compensation and would normally be disclosed. He did not render an opinion as to legal issues or the legal standards he believed should have governed Citibank's conduct. Instead he testified as to what most members of the industry would consider to be adequate fulfillment of an already established standard, *i.e.,* the requirement to disclose material facts.

Citibank also objects to the inclusion of Stanger's testimony on the grounds that he testified that he relied on Appendix F of the Rules of Fair Practice of the National Association of Securities Dealers when per-

forming due diligence. According to Citibank, such reliance is misplaced because Appendix F applies only to public offerings, and Stanger admitted at the trial that the Quintel transaction was a private placement. In addition, Citibank contends that Stanger testified without being aware of all of the facts connected with the Quintel transaction. However, Citibank had every opportunity at trial to expose any deficiencies in Stanger's testimony to the jury and to point out the importance those deficiencies might hold for Stanger's ultimate conclusion. The jury was instructed at the conclusion of the case that:

> The opinion stated by each expert who testified before you was based on particular facts as the expert himself observed them and testified to them before you, or as he was told by somebody else or as appeared to him from some paper or record. You may reject an experts opinion if you find the underlying facts to be different from those which formed the basis of his opinion. You may also reject an experts opinion if, after careful consideration of all the evidence in the case, expert and other testimony, you disagree with that opinion ... If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound or you feel it is outweighed by other evidence, you may disregard the opinion entirely.

The jury was properly instructed as to the weight they could accord Stanger's testimony and this instruction was sufficient to take into account any of the potential deficiencies of which Citibank has complained. Stanger's testimony, therefore, was properly before the jury and could be relied upon as evidence.

█ Quintel presented at trial Gajria's own testimony in support of its claim that the General Partners' acquisition of the Undeveloped Land was material. Gajria testified that he would not have invested in Flag Associates on the terms on which he invested if he had been told that the Undeveloped Land was going to be conveyed to Queens Park and that he was not going to participate in any portion of it. Citibank contends that this claim is inconsistent with the fact that after Gajria found out about the Undeveloped Land after the closing he turned down Citibank's offer to find another investor to replace him and later repaid to Citibank all of the money he borrowed to make the investment. According to Citibank, these facts establish that the General Partners' acquisition of the Undeveloped Land did not affect Gajria's judgment of the investment's value to him.

Citibank also contends that because Gajria had been involved in limited partnerships before, any evidence that Gajria inquired about the discrepancy between his contribution and the contributions of the General Partners in relation to their relative interests is not probative of the materiality of the Undeveloped Land. Citibank argues that such queries merely reflect Gajria's interest in gaining greater control of Flag, rather than his concern with the amount of compensation the General Partners would receive. Finally, Citibank claims that the jury's determination that the amount Citibank charged Gajria's account was properly payable from that account contradicts a finding of materiality. Citibank contends that it shows that the jury found Citibank to be entitled to repayment because it believed that Gajria would have made the investment regardless of the General Partners' acquisition of the Undeveloped Land.

Citibank's contentions as to what Gajria's testimony indicated or should have indicated to the jury represent one possible interpretation that could be placed on the evidence. However, it has failed to establish that its interpretation is the only one which the jury could have reached. Another possible interpretation of the evidence, one which Gajria's lawyer suggested to the jury at trial, is that Gajria's questions about the relative contribution of the General Partners revealed his concern with the degree to which they were receiving compensation even though he was putting in the majority of the money, a conclusion

that is not necessarily inconsistent with his knowledge of the workings of a limited partnership, since the contributions of each partnership will necessarily vary. Furthermore, the jury could have concluded that even though Gajria later chose to stay with the deal, the existence of the Undeveloped Land was material. The significance of the Undeveloped Land is highlighted by Russo's successful effort to prevent competition from Flag after he became aware of the Undeveloped Land. While Gajria's discovery of the General Partners' acquisition of the land may not have been enough to cause him to get out of the transaction after considerable effort had been put into it, it might have been sufficient to keep him from getting into it in the first place. In addition, the jury's decision that Citibank properly charged Gajria's account for the overdraft is not inconsistent with a finding of materiality.

The testimony of Stanger and Gajria and the evidence concerning the course of the negotiations was sufficient to support a finding that the General Partners' acquisition of the Undeveloped Land was material to the Flag investment decision. Without an explanation to Gajria of the prior negotiations between Citibank and Garrin, which was never given, it might well appear that Gajria's money was being used to give the General Partners undisclosed compensation in the form of the Undeveloped Land and such a conclusion would certainly have been material. There was sufficient evidence before the jury to reach such a conclusion which should not be disturbed on a motion for judgment n.o.v. In addition, the weight of the evidence supports the jury's conclusion that the existence of the Undeveloped Land and the history of the prior negotiations were material to the investment decision. Therefore a new trial is not warranted.

**Non-Disclosure**

■ Citibank also contends that there was no evidence to support the jury's conclusion that Citibank did not adequately disclose the acquisition of the Undeveloped Land to Quintel or Alperstein. It argues

that because Alperstein admitted reviewing the Partnership Agreement, including paragraph 6.03, more than a week before the closing, discussing Exhibit A with Maas during negotiations, and receiving all of the documents including Exhibit A the day before the closing, Alperstein received enough information to at the very least require him to make diligent inquiry. Because the jury was instructed that it is not deceptive to fail to disclose information that was easily available by diligent inquiry and that any information which Citibank adequately disclosed to Alperstein was chargeable to Quintel, Citibank claims that there was no evidence to support a finding of non-disclosure to either Gajria or Alperstein.

At the conclusion of the trial, the jury was instructed as follows:

> In determining whether disclosure was adequate, you may consider whether facts were set out in the documents and in conversation relating to the transaction in such a fashion that it is unlikely that Quintel or its agents would have seen it or become aware of its significance.

Tr. at 1315. During the trial, Ginsberg testified that Exhibit A is a metes and bounds description of some parcels of land and does not say that it is the Undeveloped Land being purchased from MPT. Russo also testified that when he read paragraph 6.03 of the Partnership Agreement he did not immediately understand that there was Undeveloped Land being carved out of the transaction.

The evidence permitted the jury to conclude that Exhibit A was never reviewed or alternatively, even if both Alperstein and Gajria saw paragraph 6.03 and Exhibit A prior to the closing, Citibank's disclosure was not sufficient to put either of them on notice or to require diligent inquiry. The jury could have concluded, based on the evidence presented, that Citibank's disclosure did no more than identify a parcel of land that was to be transferred to Queens Park without giving any indication that there was a financial connection between

the land and the Flag transaction. Such a conclusion is not inconsistent with the jury's finding that Alperstein breached a duty to Gajria by not fully investigating the Undeveloped Land. The evidence is enough to support the conclusion that even though Citibank did not disclose enough to Alperstein to constitute adequate disclosure or to put him on actual notice, Alperstein had an obligation to investigate the transaction thoroughly enough to discover its existence.

**Recklessness or Intent to Deceive**

Even though there was sufficient evidence for the jury to find that the acquisition of the Undeveloped Land was material to Gajria's investment and that Citibank failed to adequately disclose this acquisition, the jury's verdict cannot be upheld unless there was also enough evidence for the jury to conclude that Citibank acted recklessly or intended to deceive, manipulate or defraud Gajria. Quintel was required to prove reckless conduct to recover not only on its securities law claim, but also on its claims for breach of fiduciary obligations and gross negligence. Citibank now claims as its most powerful attack on the jury verdict, that even if there is enough evidence to sustain a finding of simple negligence, there is no basis for a finding of recklessness or wilful intent to defraud.

As the jury was instructed, recklessness means not merely inexcusable negligence but an extreme departure from the standard of ordinary care. It must approximate an intent to defraud. *See Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120–21 (2d Cir.1982); Tr. at 1318. An intent to defraud may be inferred from circumstantial evidence where there is sufficient supporting evidence. *See Van Alen v. Dominick & Dominick, Inc.*, 441 F.Supp. 389, 402–03 (S.D.N.Y.1976), *aff'd*, 560 F.2d 547 (2d Cir.1977).

Citibank contends that there was no real evidence from which a jury could infer that Citibank acted recklessly or with the intent to deceive Quintel. It argues that it was improper for Quintel's counsel to tell the jury that it could draw inferences from the fact that a number of Citibankers, including Bulkley and Kemper, did not testify. According to Citibank, the only admissible evidence from which the jury could infer that Citibank acted recklessly or with the intent to deceive was that Citibank had a financial interest in closing the deal in order to gain its fee. It contends that the most the jury could have concluded based on the evidence presented was that Citibank's failure to disclose amounted to only simple negligence because even if the existence of the Undeveloped Land was material to the investment decision, it was not so material that Citibank could not have concluded otherwise. Citibank argues that there was substantial evidence presented at trial to support this conclusion, including the fact that the Blue Brochure was held up for the Sanjanis to see while inspecting the Florida property, that Gajria was given drafts of the documents, and that Citibank worked to have Gajria's percentage of the transaction increased.

Citibank has again offered one possible interpretation of the facts presented at trial, an interpretation that the jury could well have chosen to adopt. However, it is not the only interpretation consistent with the testimony, and there was sufficient evidence presented to support the conclusion that the jury did reach. As Gajria points out, there was additional evidence presented from which the jury could infer recklessness or an intent to deceive. On four separate occasions, Gajria or a member of his entourage questioned the discrepancy between the relative investments of Gajria and the General Partners. The jury could reasonably infer from these queries that Citibank should have known that Gajria would have been very interested in learning that his investment was also going to provide the General Partners with undisclosed compensation in the form of the Undeveloped Land. They could also infer that Citibank could not reasonably have decided that this information was not material, particularly in light of Russo's testimony that he considered his discovery of the Undeveloped Land important enough to

require a last minute phone call to Alperstein and to require the preparation of the non-competition agreement. Citibank's failure to mention the undeveloped property on any of numerous opportunities during the Florida trip, therefore, and in particular the failure of Bulkley and Kemper to respond when Sanjanis pointed to the Undeveloped Land and asked "Is this ours?", can support an inference of recklessness or wilful intent.

Furthermore, the jury could have inferred that Citibank was guilty of more than just simple negligence from its manner of dealing with paragraph 6.03 and Exhibit A. Even if it is assumed that the failure to set forth more directly and clearly the information contained in the documents was mere negligence on Citibank's part, Citibank's failure to provide Gajria with an explanation other than "it's being typed" in response to the query about Exhibit A could support an inference of wilful intent or recklessness. The last minute delivery of Exhibit A and the other documents could suggest a wilful attempt to prevent Quintel from learning of the Undeveloped Land before the closing. Finally, the fact that Citibank was being compensated for its efforts could provide the jury with a motive for Citibank's aggressively pushing through the deal without adequate attention to Gajria's concerns. Taken altogether, the evidence represents a chain of facts which can logically lead to the conclusion reached by the jury.

██ The evidence discussed above, in my opinion, was in itself sufficient to sustain the jury's finding of recklessness or wilful intent. The issue of whether the jury was properly allowed to infer liability from the failure of various Citibankers to testify is, therefore, irrelevant to Citibank's motion for judgment n.o.v. A judgment notwithstanding the verdict may not be granted where, as here, there is substantial probative evidence to support the jury's verdict. *Unijax, Inc. v. Champion Intern., Inc.*, 683 F.2d 678 (2d Cir.1982).

██ However, a new trial may be ordered even where there is substantial evidence if prejudicial errors occurred in the admission or rejection of evidence. *Lindsay v. Ortho Pharmaceutical Corp.*, 481 F.Supp. 314 (E.D.N.Y.1979). Even if Gajria's counsel were improperly allowed to argue to the jury that inferences could be drawn against Citibank for the witnesses' failure to testify, however, this would not constitute prejudicial error in view of the sizeable amount of other evidence introduced at trial. *Id.* at 334. Because the weight of the evidence supports the jury's conclusions there are no grounds for a new trial even if the argument as to the missing witnesses was improper.

**Apportionment of Liability**

██ Finally, Citibank contends that a new trial should be granted because the evidence presented does not support the apportionment of liability between Citibank and Alperstein. It claims that Alperstein participated in the negotiations for the transaction, that he was put on notice of the Undeveloped Land, and that he had a duty to convey this information to Quintel. It argues that Alperstein's liability to Gajria goes much further than Citibank's because he had an obligation to protect Gajria and that if he had successfully fulfilled that obligation, as Citibank could have expected him to, there would have been no liability.

Citibank is correct in arguing that Alperstein's liability was not necessarily limited to the amount of his fee alone. Alperstein could have been found liable for any and all damages that were the proximate cause of his actions. The jury could have concluded that but for his negligence, the existence of the Undeveloped Land would have been uncovered and Quintel would have been able to avoid paying the $600,000 Citibank fee. However, I find that there is ample evidence to support the jury's decision to apportion damages in the manner in which it did. Citibank's involvement with the Flag transaction was much more substantial than Alperstein's. Citibank had full knowledge of the Undeveloped Land at all times, whereas Alperstein had to discover

it by due diligence. Most important, to find Alperstein liable the jury only had to conclude that he was negligent, whereas Citibank was found guilty of gross negligence or fraudulent intent. The weight of the evidence supports the conclusion that Citibank's culpability significantly outweighed Alperstein's and that the jury was justified in finding Citibank responsible for 97.2% of Quintel's damages.

Because there was sufficient probative evidence introduced at trial to support the jury's verdict, Citibank's motion for a judgment n.o.v. is denied. Similarly, because the weight of the evidence introduced supports the jury's verdict and because Citibank has not presented evidence of prejudicial error, Citibank's motion for a new trial is denied.

### Alperstein's Cross-Motions for Judgment n.o.v. and a New Trial

At the conclusion of the trial, the jury found that prior to the closing, Alperstein had an obligation to discover the existence of the Undeveloped Land and the manner and cost of its acquisition, that Alperstein did not exercise ordinary and reasonable care in representing Quintel, that Alperstein was the proximate cause of damage to Quintel, that Alperstein caused 2.8% of the $617,500 total damages assessed against Citibank, and that Quintel did not ratify the investment. In his cross-motion for judgment n.o.v. or for a new trial, Alperstein contends there is no evidence to support the jury's conclusion that Alperstein was under a duty to discover the land and that Alperstein breached that duty, and that the evidence showed that Gajria entered into the Acquisition Agreement before retaining Alperstein and that Alperstein was not the proximate cause of any damage suffered by Gajria.

### Breach of Duty of Care

At trial, evidence was presented that on August 2, before arriving in the United States, Gajria committed to investing $2.7 million in the Flag investment on the basis of communications with Citibank and the Sanjanis. There was also testimony that when Gajria met with Citibank on August 6

and decided to inspect the properties, he was told that he could back out of his commitment after the inspection. Gajria met with Alperstein, who had already received the Red Brochure, on August 6, and although he did not officially retain Alperstein or his firm, he sought their advice as to the investment. After going to Florida, Gajria agreed to the investment and signed the Acquisition Agreement without further consultations with Alperstein. After signing the Agreement, Gajria told Alperstein that he had decided to take the investment and asked him "to represent [him] and take everything legal and every legal interest I have in the deal." No further discussion of the scope of Alperstein's duty took place.

On the basis of this evidence Alperstein now contends that Gajria was already committed to the investment when he was retained and that accordingly the scope of Alperstein's duty was very limited. He argues that he undertook only to ensure that Gajria receive everything that was described in the Red Brochure and that Gajria never explicitly broadened this duty to include "the pursuit of a different transaction involving undeveloped land."

 While it may be true that "[a]n attorney has no duty to advise a client as to the feasibility of a financial investment after his client has contracted for the purchase," *Vitale v. Coyne Realty, Inc.*, 66 A.D.2d 562, 414 N.Y.S.2d 388, 392 (4th Dept.1979), this does not mean that the duty of an attorney retained after his client has made a commitment is limited to simply carrying out the paperwork. At trial, Gajria's expert witness Howard Feinsand ("Feinsand") testified that an attorney should review underlying agreements and determine the compensation that is to be paid the various parties in a transaction. The jury could properly conclude from both Feinsand's testimony and the circumstances of the relationship established between Gajria and Alperstein that Alperstein implicitly undertook a duty to thoroughly investigate all matters affecting Gajria's rights, and in particular to investigate the

manner in which the General Partners were compensated.

Alperstein also argues that there was no evidence presented at trial to support the jury's finding that Alperstein breached a duty it owed Gajria. However, Alperstein's testimony at trial was enough to support a conclusion that Alperstein did not exercise ordinary and reasonable care in representing and advising Gajria. Feinsand testified that by not making further inquiry into the fact that the Partnership Agreement exempted certain property and by not inquiring into the compensation received by the General Partners, Alperstein deviated from the industry standard. Although Alperstein claims that Citibank so buried the facts that he was under no obligation to discover them, Alperstein failed to follow up on Citibank's references to Exhibit A or to closely examine the underlying documents. While Gajria could not require perfection from Alperstein, he was entitled to the performance of Alperstein's duties in a manner that would satisfy the ordinary standard of care. The evidence presented supports the conclusion that Alperstein breached his duty of care.

### Proximate Cause and Damages

In order to establish that Alperstein's malpractice was a proximate cause of Gajria's damage, Gajria had to establish that he would not have entered into the transaction but for Alperstein's negligence in failing to discover the undisclosed land, and that this failure damaged Gajria. *Newman v. Silver,* 553 F.Supp. 485 (S.D.N.Y.1982), *modified on other grounds,* 713 F.2d 14 (2d Cir.1983). Alperstein first contends that because Gajria was already committed to the transaction before Alperstein was retained, his actions cannot be considered the proximate cause of damage incurred because of the transaction. However, the evidence presented at trial revealed that if Alperstein had discovered the existence of the Undeveloped Land at any time prior to the closing, he could have prevented Gajria from going through with the investment. Gajria could have invoked paragraph 4(d) of the Acquisition Agreement, which relieved Gajria from his obligation to pay Citibank the fee on the grounds of a breach by Citibank. Thus, the jury could have concluded that Alperstein's failure to exercise ordinary care was the proximate cause of Gajria's damages.

Alperstein also contends that because Gajria has received a full recovery of his fee from Citibank and has also received back all of his investment, he has successfully concluded his investment, and that therefore Gajria did not suffer any damage. However, the fact that a client successfully manages to undo the damage caused by a lawyer does not mean that no damage occurred. There was sufficient evidence presented at trial to support the conclusion that Gajria was damaged to the extent of his legal and Citibank's investment fees, and that Alperstein was a proximate cause of that damage.

### Ratification

Alperstein also contends that because Quintel voluntarily paid Alperstein's fee after learning of the Undeveloped Land, the contract was ratified and all defects in the performance of the contract were waived. The Alperstein bill for $17,000 was submitted to Quintel, via Citibank, almost a month after Gajria discovered the Undeveloped Land. Quintel's corporate officers in the Bahamas thereafter paid the bill without protest on October 31, 1979 after it was approved by Kalos at Citibank. The managing directors of Quintel were chosen by Citibank and were employees of a Citibank subsidiary.

Given the particular circumstances of this case, the payment of Alperstein's bill cannot be seen as a ratification of the contract between Gajria and Alperstein. In order to find a ratification, "it is necessary to show that the principal had knowledge of the material facts and circumstances and that he acted in the light of such knowledge." *First Nat'l Bank of Morrisville v. Starke Design, Inc.,* 11 A.D.2d 595, 200 N.Y.S.2d 708 (3d Dep't 1960). In the case at hand, the evidence was sufficient to support a finding that the payment did not

reflect a decision made in light of Gajria's knowledge about the Undeveloped Land. At trial, Gajria testified that he protested when he found the bill was paid. Given the complex relationships established between Citibank, Quintel, Gajria and Alperstein, the payment of Alperstein's bill by Citibank employees who were members of Quintel after approval by Citibank does not necessarily require a finding of ratification.

## Imputation of Citibank's Knowledge to Gajria

 Alperstein argues that he cannot be held liable for failing to discover facts which Gajria was constructively aware of through his agent, Citibank. At trial, Citibank admitted that it was at all times aware of the manner and cost of the General Partners' acquisition of the Undeveloped Land. However, where the fraudulent conduct of an agent is such that the agent would withhold facts from the principal, his knowledge is not imputed to the principal. *See Marine Midland Bank v. John E. Russo Produce Co.*, 50 N.Y.2d 31, 427 N.Y.S.2d 961, 405 N.E.2d 205 (1980); *Bertran Packing, Inc. v. Transworld Fabricators, Inc.*, 50 A.D.2d 542, 375 N.Y. S.2d 335 (1st Dept.1975). The jury concluded that Citibank did not disclose the existence of the Undeveloped Land to Gajria and that it had acted recklessly or with a fraudulent intent. In these circumstances, Citibank's knowledge cannot justifiably be imputed to Gajria. This is not a situation where the agent's knowledge should be imputed despite the fraud because the agent's failure to reveal the information resulted in the violation of a contractual duty of the principal to an injured third party. *See, e.g., Greene v. Cuykendall*, 40 N.Y.S.2d 801 (Sup.Ct. Cayuga Co.1943). Citibank's failure to reveal the facts to Gajria, the principal, did not result in the violation of a duty to Alperstein since Gajria owed no duty to Alperstein. Instead, Alperstein had an obligation to investigate Citibank's actions thoroughly enough to protect Gajria from its actions.

Because there was sufficient evidence to support the jury's findings as to Citibank's liability, Alperstein's motion for judgment n.o.v. is denied. Similarly, because the weight of the evidence supports the jury's findings, his motion for a new trial is denied.

## Quintel's Claim of Prejudgment Interest

 Quintel has moved for the award of prejudgment interest from Citibank and Alperstein on the sum of $617,500 in damages awarded to Quintel by the jury. The award of prejudgment interest on the federal securities claims is governed by federal law and by state law on the pendent state claims. *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 692 n. 13 (2d Cir.1983); *Spector v. Mermelstein*, 485 F.2d 474, 481 (2d Cir.1973).

 The award of prejudgment interest in New York is governed by CPLR § 5001(a), which provides in pertinent part: *(a) Action in which recoverable.* Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

Under New York CPLR § 5001(a), prejudgment interest is recoverable as a matter of right in property damage cases brought at law. Where such cases are brought in equity, an award of prejudgment interest is in the discretion of the court. *See* 7B McKinney's Consol.Laws of N.Y., CPLR § 5001, Practice Commentary at 525.

 Quintel is entitled to recover prejudgment interest from Citibank on its state claims of common law fraud and gross negligence because they both involve claims for money damages in which the harm was to a property interest. Similarly, Quintel is entitled as a matter of right to recover prejudgment interest from Alperstein on its malpractice claim. *Spector v. Mermelstein, supra,* 485 F.2d at 482 (mandatory award of prejudgment interest extends to attorney malpractice claim despite

"equitable" claim of breach of fiduciary duty). *Spector* also supports the conclusion that Gajria should be awarded prejudgment interest on sums awarded because of Citibank's breach of fiduciary duty. *See also Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 637 F.2d 77 (2d Cir. 1980) ("An award of prejudgment interest ... is customary in cases involving a breach of fiduciary duties").

■■■■■ Federal law makes no provision for the award of prejudgment interest, *see* 28 U.S.C.A. § 1961, but a court is authorized to award such interest as part of its equitable powers. *See Marshall v. Burger King Corp.*, 509 F.Supp. 353, 356 (E.D.N.Y. 1981). In exercising its discretionary powers, a court must consider two principles: compensation and fairness. An award of prejudgment interest is principally intended to compensate an aggrieved party for the wrongful deprivation of the use of its money. *Rolf v. Blyth, Eastman, supra*, 637 F.2d at 87; *Lesjac Realty Corp. v. Mulhauser*, 43 Misc.2d 439, 251 N.Y.S.2d 62, 64 (Sup.Ct. Nassau Co.1964). In addition to principles of compensation, in federal securities cases a court must also be guided by "considerations of fairness." *Chris-Craft Indus. Inc. v. Piper Aircraft Corp.*, 516 F.2d 172, 191 (2d Cir.1975), *rev'd on other grounds*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). As Gajria points out, during the approximately six years in which Gajria did not have the use of the $600,000 paid to Citibank, unusually high interest rates prevailed. During that time, Gajria was deprived of the opportunity to realize a fair rate of return on his money. Considerations of compensation and fairness justify holding Gajria entitled to prejudgment interest on the federal securities claims as well as the state claims.

■■■■ This determination is not affected by Alperstein's and Citibank's claims that Quintel has already been compensated for prejudgment interest on the amount of the fees through its subsequent agreement with the General Partners. The October 18, 1984 opinion held that Quintel's resolution of his dispute with the General Part-

ners represented the return of all it had paid, plus interest, in exchange for a release of Quintel's 49% interest in Flag. The rescission of the transaction with the General Partners is totally unrelated, financially or otherwise, to Quintel's claims for the return of fees paid to Alperstein and Citibank. Because different injuries are involved, N.Y.G.O.L. § 15–108 (McKinneys 1978) does not apply.

■■■ Citibank and Alperstein also contend that because Quintel refused an offer of settlement by each of them in the amount ultimately awarded against them which Gajria considerations of fairness require that it now be estopped from claiming prejudgment interest. As to Citibank's claim, Citibank has presented no direct proof that it actually offered to return to Quintel the $600,000 fee. Citibank points to testimony that Citibank's Kemper told Gajria "you can get your money back" after Gajria objected following his discovery of the Undeveloped Land. There is no evidence, however, that the "money" referred to the fee as well as the actual investment price. Both Alperstein and Gajria testified that at no time did Citibank specifically offer to refund the fee. The evidence presented fails to establish that Citibank offered to return the investment advisory fee. Thus, Quintel is not estopped from claiming prejudgment interest from Citibank.

■■■ As to Alperstein's claim, it is uncontested that Gajria refused an offer of judgment in the amount of $17,500 on May 25, 1984. Although an award of prejudgment interest pursuant to § 5001(a) is mandatory in attorney malpractice cases, *see Spector v. Mermelstein, supra*, 485 F.2d 474, New York courts have held that "the right to interest may be lost on equitable principles of estoppel, such as a refusal by a creditor to accept a tender." *Knab Bros. Inc. v. Town of Lewistown*, 58 A.D.2d 1016, 397 N.Y.S.2d 45, 46 (4th Dep't 1977); *see also Feldman v. Brodsky*, 12 A.D.2d 347, 211 N.Y.S.2d 56, 59 (1st Dep't 1961) (post-judgment interest). Furthermore, CPLR § 3219, which establishes a specific

procedure by which a defendant may make a tender of payment in a contract action, holds that "if the tender is not accepted and the claimant fails to obtain a more favorable judgment, he shall not recover interest or costs from the time of the offer, but shall pay costs for defending against the claim from that time." Under the circumstances of this case, Alperstein's offer of judgment prior to trial was sufficient to stop the running of interest. As noted above, one of the principle purposes of allowing prejudgment interest is to compensate the plaintiff for its inability to use the money. As of May 25, 1984, the date of Alperstein's tender, Quintel could have had the use of that money, and Alperstein should not be penalized for Quintel's refusal of the tender.

■ Under New York law, the award of prejudgment interest "is computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred." New York CPLR § 5001(b). The award of prejudgment interest from Citibank must therefore be computed from August 14, 1979, the date of the closing, because that was the date on which Gajria's cause of action against Citibank arose. As to Alperstein's obligation, he contends that even if the cause of action for malpractice also arose on August 14, 1979, the damages representing Gajria's recovery as against Alperstein, the $17,500 legal fee, were not incurred until the bill for the fee was actually paid. However, Alperstein was sued as a joint tortfeasor with Citibank, and could have been held liable for considerably more than just the $17,500 fee. He was held responsible for 2.8% of the total damages, an amount which undoubtedly was chosen by the jury because it is the amount of the fee but which nonetheless represents Alperstein's responsibility for the total damages incurred by Gajria. Alperstein must therefore pay prejudgment interest to Gajria from August 14, 1979 to May 25, 1984.

■ Under New York law, prejudgment interest to Gajria must be calculated at a rate of six percent until June 25, 1981 and nine percent thereafter. CPLR § 5004, *see National Enerdrill Corp. v. Crown Drilling Inc.,* 119 Misc.2d 162, 462 N.Y.S.2d 533, 534 (Sup.Ct.N.Y.Co.1983).

**Citibank's Claim for Prejudgment Interest**

■ Citibank contends that it is entitled to prejudgment interest on its third party claim against Gajria for nonpayment of an overdraft. Because this award falls within the mandates of § 5001(a), Citibank is entitled to collect prejudgment interest from Gajria from May 5, 1980, the date of the overdraft, at a rate of 6% until June 25, 1981 and nine percent thereafter.

**Costs**

■ Fed.R.Civ.P. 68 provides in pertinent part:

At any time more than 10 days before the trial begins, a party defending a claim may serve upon the adverse party an offer to allow judgment to be taken against him ... If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.

Because Alperstein made an offer of judgment to Quintel on May 25, 1984 that was not exceeded by the final judgment, Quintel must pay the costs incurred by Alperstein after that date.

■ Alperstein contends that the phrase "costs incurred" must include attorney's fees in order to make the Rule a meaningful sanction. In support, Alperstein points to a proposed amendment to Rule 68, *see* 98 F.R.D. 337, 361–67 (1983), which would permit an award of attorney's fees against a party that does not obtain a verdict more favorable than the opposing party's Rule 68 offer. However, the proposed amendment has not yet been approved and, therefore, is not incorporated in the Federal Rules of Civil Procedure. *See Association for Retarded Citizens of*

*North Dakota v. Olson,* 561 F.Supp. 495, 498–99 (D.N.D.1982). The circumstances of this case do not warrant granting Alperstein attorney's fees, nor does Fed.R.Civ.P. 11 support such an award in this case.

As to the costs incurred by Gajria in this case, all costs incurred prior to May 25, 1984, the date of Alperstein's offer, are to be apportioned between Citibank and Alperstein in accordance with their respective liabilities. After that date, Gajria may recover from Citibank its portion of costs and must forfeit the amount of costs which would have been apportioned to Alperstein had Gajria not rejected Alperstein's offer.

The motions are resolved as stated above. Gajria shall submit a judgment within ten (10) days in accordance with the above decisions.

IT IS SO ORDERED.