**CAPITAL DISTRICT PHYSICIAN'S HEALTH PLAN, Plaintiff,**

v.

**Michael O'HIGGINS, d/b/a Michael O'Higgins & Co., and David Oberting, Defendants.**

**No. 94–CV–61.**

United States District Court, N.D. New York.

Jan. 16, 1997.

---

Iseman, Cunningham, Riester & Hyde, Albany, NY (Robert H. Iseman, Michael J. McNeil, of counsel), for Plaintiff.

Thorn & Gershon, Albany, NY (Arthur H. Thorn, Paul J. Catone, of counsel), for Defendants.

### MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

In the wake of this court's prior decision granting plaintiff Capital District Physician's Health Plan ("CDPHP") partial summary judgment against defendant Michael O'Higgins, both parties have filed additional motions. The plaintiff, a health maintenance organization in the Albany area, moves to certify the partial judgment for immediate appeal pursuant to Federal Rule of Civil Procedure 54(b), and for a preliminary injunction precluding defendant from encumbering or alienating assets against which a judgment may be satisfied. Defendant, a registered investment adviser, moves for reconsideration of the summary judgment order pursuant to Local Rule 7.1(g). All the motions are opposed. The following opinion constitutes the court's disposition of these matters.

## I. BACKGROUND

For an exposition of the procedural history and facts of this case the reader is referred to this court's prior opinion granting partial summary judgment, number 72 on the docket and reported at 939 F.Supp. 992 (N.D.N.Y. 1996). Briefly, defendant served as investment adviser for CDPHP, at one time responsible for half its portfolio. Defendant purchased a security known as a PAC–IO from his brother for CDPHP's account. The investment soon turned sour. Plaintiff brought suit. After discovery the parties filed cross-motions for summary judgment. The court granted the motion with respect to one of plaintiff's causes of action, viz. the claim that defendant breached his fiduciary duty to plaintiff by purchasing the PAC–IO from his brother without disclosing the conflict. The court also found that defendant's proffered affirmative defense of ratification was insufficient as a matter of law to defeat summary judgment on the fiduciary duty claim. Additionally, the court held that CDPHP's claim based on the Investment Advisers Act of 1940, i.e. the "brochure rule" claim, was barred by the statute of limitations. All other claims were infused with material factual discrepancies requiring trial.

Evidently concerned that defendant was secreting or transferring assets against which a final judgment eventually could be satisfied, plaintiff moved for equitable relief to preserve those assets and for Rule 54(b) certification so that execution of judgment could proceed without awaiting the resolution of all other claims. Defendant objected to the injunction and certification and timely moved for reconsideration of the summary judgment order. Discussion follows, beginning with defendant's motion.

## II. DISCUSSION

### A. Reconsideration

A motion for reconsideration, other than one under Rule 60, is governed by this district's Local Rule 7.1(g) which requires a memorandum "concisely setting forth the matters or controlling decisions which the movant believes the court has overlooked." This court has previously identified three

grounds for reconsideration: (1) an intervening change of controlling law, (2) the emergence of new evidence which bears upon the issues decided, and (3) the necessity to correct clear error or to prevent a manifest injustice. *Frutiger v. Hamilton Central Sch. Dist.*, No. 90–CV–303, 1993 WL 358480, at *1 (N.D.N.Y. Sept. 9, 1993), *appeal dismissed*, 28 F.3d 102 (2d Cir.1994) (table). Although *Frutiger* was decided under former Local Rule 10(m), the law is the same under the current rule, and all the judges in this district are in agreement. *See, e.g., Alteri v. General Motors Corp.*, 940 F.Supp. 47, 49 (N.D.N.Y.1996) (Pooler, J.); *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 889 F.Supp. 65, 66 (N.D.N.Y.1995) (McAvoy, C.J.), *aff'd*, 90 F.3d 671 (2d Cir. 1996); *Agway, Inc. v. Travelers Indem. Co.*, No. 93–CV–557, 1991 WL 642767, at *1 (N.D.N.Y. Jan. 24, 1994) (Cholakis, J.); *Palaimo v. Lutz*, 837 F.Supp. 55, 55 (N.D.N.Y. 1993) (Scullin, J.); *Fox v. Board of Trustees*, 148 F.R.D. 474, 477 (N.D.N.Y.1993) (McCurn, Sr. J.), *aff'd*, 42 F.3d 135 (2d Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2634, 132 L.Ed.2d 873 (1995).

Defendant O'Higgins asks the court to reconsider three points: (1) whether causation of damages was proved as a matter of law; (2) whether the measure of damages was appropriate, and (3) whether the appropriate date for the calculation of damages was used. Def.'s Mem. Law, Doc. 80, at 1. Additionally, defendant's opposition to plaintiff's motion for certification was accompanied by two new affidavits suggesting there is a sounder factual predicate for the ratification defense than the court originally thought. *See* Exs. C & D att'd to Def.'s Aff., Doc. 86. The court treats this as a fourth asserted ground for reconsideration.

### 1. Causation

■ Taking the issues seriatim, the court observes first that the question of causation was not neglected in this court's prior decision: pages 364 to 366 of the slip opinion, Doc. 72, dealt extensively with the issue. Motions for reconsideration are not opportunities to relitigate competently decided issues and should not be considered a last chance to

sway the court. *Libutti v. United States*, 910 F.Supp. 67, 70 (N.D.N.Y.1995). A mere point of disagreement between the court and a litigant is not a basis for reconsideration. *Rivera v. Prudential Ins. Co.*, Nos. 95–CV–0829 & 95–CV–0830, 1996 WL 637555, at *16 (N.D.N.Y. Oct. 21, 1996).

For instance, defendant argues that he had unlimited discretion to purchase securities for CDPHP's account pursuant to the investment advisory agreement, including the authority to buy from his blood brother. Doc. 80 at 3–5. Therefore, the argument goes, defendant's purchase of the PAC–IOs could not have caused the loss, since CDPHP was not owed the duty of disclosure and could not have vetoed the investment. This court was fully aware of this argument when deciding the cross-motions for summary judgment and rejected it. This court held that notwithstanding the discretionary nature of the CDPHP account, defendant could not escape the obligation to disclose this particular conflict of interest. *See* Mem.–Dec. & Ord., Doc. 72, at 22–23 (citing *Leib v. Merrill Lynch, Pierce, Fenner & Smith*, 461 F.Supp. 951 (E.D.Mich.1978), *aff'd*, 647 F.2d 165 (6th Cir.1981) (table)). Furthermore, the argument that CDPHP could not have prevented O'Higgins from buying any security he wished for CDPHP's account is specious. Such authority is a necessary incident of the agency relationship, of CDPHP's power to terminate O'Higgins as investment adviser, and is correlative with O'Higgins' duty to disclose conflicts of interest. *See* 3 N.Y.Jur.2d Agency § 189 (agent's duty to obey instructions).

As a second objection to this court's causation analysis, defendant contends that the failure to disclose the conflict was not a substantial factor causing CDPHP's loss because the record fails "to establish that the purchase would not have been made if the omitted information had been disclosed." Def.'s Mem. Law, Doc. 80, at 6. In support, defendant cites *Burke v. Jacoby*, 981 F.2d 1372 (2d Cir.1992), *cert. denied*, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993), a securities fraud case wherein the Second Circuit held that when a material omission is involved, transaction causation may be pre-

sumed but loss causation must be proven. Again, this court's prior opinion considered *Burke* carefully, Doc. 72, at 38–39, and ruled that the omission was a substantial factor contributing to the loss. This issue is not novel, and defendant has identified no new controlling precedent nor flushed out any manifest error justifying reconsideration.

In his third attack upon causation, defendant avers that the damages were too speculative to prove that the omission caused the loss. Doc. 80 at 8. This issue has already been fully briefed, professionally argued, and deliberately decided. The omission was material and was a substantial contributor to the loss CDPHP suffered on the PAC–IOs bought from defendant's brother. Without the information, CDPHP could not intelligently question or veto the investment. Defendant is referred to the summary judgment opinion for further explanation.

Since defendant has raised no matters the court has overlooked or pointed to any manifest or obvious error in the court's disposition of the causation issue, defendant's motion for reconsideration upon this ground is denied.

### 2. *Measure of Damages*

■ Defendant maintains that the calculations of damages made in the summary judgment order was erroneous. Doc. 80 at 10. In that opinion, the court observed that

> evidence of what would have transpired had the $5 million not been invested in the PAC–IOs is absent. This court will therefore restrict the damages calculation to what did happen, and award damages for the loss that defendant's material nondisclosure was a "substantial factor" in causing.

Doc. 72 at 42 (citation omitted).

The court consequently held that the loss occasioned by defendant's breach of fiduciary duty was "the difference between the cost of the investment and its final sale price, minus any interest payments the PAC–IOs made." *Id.* That amount is $1,863,553.05.[1]

Defendant suggests that this court misapplied the case of *Chasins v. Smith, Barney & Co.*, 305 F.Supp. 489 (S.D.N.Y.1969), *aff'd*, 438 F.2d 1167 (2d Cir.1970), in deciding how to measure damages caused by the breach. Specifically, O'Higgins points out that the defendant in *Chasins* was the market-maker for the securities he bought on behalf of the plaintiff. *Id.* at 495–96. In those circumstances, it was impossible to tell what the price of the securities should have been, because the defendant essentially set the price. Without any way of determining fair market value of those securities, the Southern District awarded plaintiff the loss upon resale, as this court has done in the instant matter. *Id.* at 496.

In this case there is no allegation that defendant or his brother were the market-makers in the PAC–IOs. But this is of no moment. Defendant has overlooked the Second Circuit's mandate in the *Chasins* case. The defendant in that dispute made a similar argument on appeal as O'Higgins makes here:

> Smith, Barney's final challenge is to the amount of damages awarded to Chasins, claiming that only the difference between the price charged him on his purchases and the fair market value on the purchase dates could be granted; we disagree.... Although Smith, Barney submitted an affidavit on the issue of damages, indicating that the price Chasins paid for his purchases was the same as that generally available from other dealers for the same securities, that is not the question here. The issue is not whether Smith, Barney was actually manipulating the price on Chasins or whether he paid a fair price, but rather the possible effect of disclosure of Smith, Barney's market-making role on Chasins' decision to purchase at all on Smith, Barney's recommendation. It is the latter inducement to purchase by Smith, Barney without disclosure of its interest that is the basis of this violation; the evil in such a case is that recommendations to clients will be based upon the best

---

1. CDPHP also seeks prejudgment interest at the New York statutory rate of 9 percent. *See* Pl.'s Mem.Law, Doc. 74, at 8.

interests of the dealer rather than the client.

438 F.2d at 1173.

The Court of Appeals then ruled that the difference between original purchase and re-sale price is an appropriate measure when "the evil is not the price" plaintiff pays, but rather the failure to disclose the adverse interest. *Id.* Comparison with the matter sub judice is apt. The issue here is not whether O'Higgins obtained a fair price from his brother for the PAC–IOs bought for CDPHP's account, but rather defendant's failure to disclose the conflict to his client. The court declines to revisit the issue of damage calculation.

### 3. Date From Which Damages Are Measured

■ O'Higgins argues that damages should be measured from March 19, 1993—the date he met with CDPHP's finance committee to discuss the PAC–IO investment—rather than from January 26, 1993, the date of the original purchase. Def.'s Mem. Law, Doc. 80, at 11. In those two months, the investment declined about $1.3 million in value. O'Higgins argument in this regard rests on this passage from the partial summary judgment order:

> Since O'Higgins was required to act in the best interests of his client, there was even more reason to disclose a conflict the client could not know about—before the invest-ment was made *or at the very least at the meeting when that specific investment was under scrutiny.*

Doc. 72 at 23 (italics added for emphasis).

Defendant pins his hopes on the last clause, reasoning that the omission giving rise to the breach did not occur until he failed to dis-close the conflict at the March 19 meeting with CDPHP's finance committee during which the PAC–IO investment was discussed.

This is more weight than these words can bear. The breach of fiduciary duty occurred when the purchase was made from defen-dant's brother. In its prior order the court was merely expressing surprise that defen-dant did not disclose the conflict even when he was haled before the finance committee and interrogated specifically about the PAC–IO transaction. Disclosure at that time, however, would not have excused the initial purchase from his brother. Only intelligent ratification by CDPHP of the transaction could have accomplished that on March 19. No ground for reconsideration is implicated here.

### 4. Ratification

■ In its prior order this court deter-mined that defendant's proffered ratification defense was no barrier to granting summary judgment on the breach of fiduciary duty claim. O'Higgins' failure to disclose that the PAC–IOs had been purchased from his brother meant that CDPHP could not have had full knowledge of the underlying facts, one of the requirements for a successful rati-fication defense. *See Monarch Ins. Co. v. Insurance Corp. of Ireland,* 835 F.2d 32, 36 (2d Cir.1987).

By the close of discovery and after the summary judgment motions had been sub-mitted, the undisputed facts established this timeline relevant to ratification. The PAC–IOs were purchased by defendant on Janu-ary 26, 1993. Michael O'Higgins Dep. Tr., Doc. 67, at 127. At that time, CDPHP's finance committee met monthly. Every two months, CDPHP's director of finance pre-pared an investment report summarizing the performance of the plan's investment advis-ers. The finance committee would review the reports every other month, and vote to approve or disapprove investment decisions made in the previous two months by the plan's advisers. The board of directors also met every two months to approve or disap-prove investment decisions previously re-viewed by the finance committee. Thomas P. Collins Dep. Tr., Doc. 68, at 40–42. Be-tween the purchase of the PAC–IOs on Janu-ary 26 and the March 19 meeting, CDPHP became aware of and curious about the in-vestment. Mary Connolly, CDPHP's di-rector of finance, telephoned Thomas P. Col-lins, a CDPHP board member and chairman of the finance committee, sometime in March to express concern about the security. *Id.* at 53–54. Collins instructed Connolly to find out more about the investment. Ellen

Pierce, CDPHP's controller, and Tim Rock, a senior accountant, made inquiries in early March. Michael O'Higgins was out of the country at that time and his employee and codefendant David Oberting responded on his behalf. On March 5, 1993 Oberting sent a one-page facsimile transmission addressed to Tim Rock and Ellen Pierce relating to the PAC–IOs. Ex. C. att'd to Defs.' Notice of Mot., Doc. 42. On that same date, he sent a letter to Mr. Rock with other information. Ex. D att'd to *id.* That letter appears to have been copied nearly verbatim from a handwritten fax from James O'Higgins, the broker, to Oberting. Ex. B. att'd to Culnan Aff., Doc. 46. Tim Rock received another fax from Oberting on March 8. Ex. G att'd to Defs.' Notice of Mot., Doc. 42. Ellen Pierce received additional faxes from Oberting on March 9, Ex. E att'd to *id.*, and March 18, the day before the finance committee meeting, Ex. F att'd to *id.* These transmissions all purported to describe some characteristic of the PAC–IOs, and appear to be in response to queries submitted by Ellen Pierce and Tim Rock. O'Higgins appeared before CDPHP's finance committee on March 19, 1993 to explain the transaction. On that same night O'Higgins informed the finance committee chair that he would be resigning, and did so officially on March 31, 1993. *Id.* at 59–60. CDPHP searched for another investment adviser to manage the funds previously under defendant's control. In May of 1993 First Albany Corporation took over the O'Higgins portfolio and advised CDPHP on how to dispose of the PAC–IO investment. May 21, 1993 Fin.Comm.Mins. at 5.

Because at no point did it appear that defendant disclosed to CDPHP the role of his brother in the PAC–IO transaction, this court has ruled that plaintiff could not have had the full knowledge requisite to effective ratification. Doc. 72 at 43. In opposition to CDPHP's motion for certification however, O'Higgins has tendered two affidavits, one from defendant's brother and another from codefendant David Oberting. Oberting's affidavit describes a conversation he had with a CDPHP employee "some time before the March 19th meeting and after CDPHP had received its February statement." Ex. C att'd to Doc. 86, at 1. Oberting reports that

he referred the caller, who was asking about the PAC–IO purchase, to James O'Higgins. Oberting concludes that "CDPHP was aware of the fact that James O'Higgins had acted as the broker for this investment." *Id.* at 2. James O'Higgins' affidavit confirms that he was called "[i]n advance of [the March 19th] meeting" and he spoke to either Mary Connolly or Ellen Pierce of CDPHP. Ex. D att'd to Doc. 86, at 1–2. James O'Higgins states that "CDPHP was aware of the fact that I had been the broker for my brother with respect to this investment." *Id.* ¶ 5. Although these affidavits were submitted in opposition to CDPHP's motion for Rule 54(b) certification, it is clear they are also relevant to Michael O'Higgins' motion for reconsideration. If the affidavits are taken as support for the proposition that CDPHP knew that defendant bought the PAC–IOs from his own brother, this court's prior decision holding that CDPHP's ignorance of this material information precluded effective ratification is undermined.

Plaintiff has objected by letter that the affidavits are improper new evidence. It is true that new evidence submitted on reconsideration must have been unavailable previously through the exercise of due diligence. *United States v. Potamkin Cadillac Corp.*, 697 F.2d 491, 493 (2d Cir.) (new evidence in Rule 60 motion) (quoted case omitted), *cert. denied*, 462 U.S. 1144, 103 S.Ct. 3128, 77 L.Ed.2d 1379 (1983). As both Oberting and James O'Higgins were deposed, it cannot be disputed that this information was available to defendant and could have been easily elicited for the record. Moreover, it is beyond peradventure that CDPHP's knowledge, or lack thereof, of the conflict of interest was an important and apparent issue to both parties at all relevant times during discovery. As this court has observed, its opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Frutiger v. Hamilton Cent. Sch. Dist.*, No. 90–CV–303, 1993 WL 358480, at *1 (N.D.N.Y. Sept. 9, 1993) (quoting *Quaker Alloy Casting Co. v. Gulfco Indus.*, 123 F.R.D. 282, 288 (N.D.Ill.1988)), *appeal dismissed*, 28 F.3d 102 (2d Cir.1994) (table). When parties submit cross-motions for sum-

mary judgment after extensive discovery involving many hundreds of pages of deposition transcripts, affidavits, and documentary evidence, this court invests significant energy to decide them. Understand then the court's frustration when evidence contradicting what appears to be an uncontested factual predicate is not brought to the court's attention until *after* an order issues. To remedy this waste of judicial resources, the rule has developed that evidence which is not truly new—that is, it was known at the time of the original motion, or should have been known—will not be weighed on a motion for reconsideration. *E.g., Atlantic States Legal Found. v. Karg Bros.,* 841 F.Supp. 51, 56–57 (N.D.N.Y.1993).

Defendant counters that the affidavits do not contain new allegations or evidence, but that the prior depositions of James O'Higgins and codefendant David Oberting reflected that CDPHP had prior knowledge of the conflict of interest. Specifically, defendant refers us to pages 153 and 154 of James O'Higgins' deposition transcript. However, nowhere on those pages is there even the vaguest suggestion that James O'Higgins, or anyone else, informed CDPHP about the conflict of interest before the March 19 meeting. There was some questioning about James' knowledge that CDPHP was Michael's client:

Q. Did there come a point in time, in 1993, when you became aware that your brother's client was the Capital District Physician's Health Plan which had purchased this security?

A. [James O'Higgins] In 1993? I don't recall.

Q. Did there come a time, at any time, when you became aware that the Capital District Physician's Health Plan was the client that had purchased this security?

A. Yes.

Q. When was that?

A. I don't remember.

Ex. 1 att'd to Doc. 68, at 153–54.

But these answers do not imply that CDPHP may have known that James O'Higgins, the broker for the PAC–IO transaction, was the brother of Michael O'Higgins, the investment adviser, before March 19, 1993. Even if this passage had been flagged to the court at the original summary judgment motion, rather than on reconsideration, it would have been insufficient to create a material issue of fact concerning CDPHP's knowledge.

As for David Oberting, defendant does not refer to any deposition testimony or other evidence before the court prior to the summary judgment order which suggested CDPHP may have become aware of the conflict before the March 19 meeting. Nonetheless, the court has again reviewed Mr. Oberting's deposition transcript, and particularly pages 54 and sequential wherein there is questioning concerning Oberting's contacts with CDPHP. It appears that Oberting sent a letter to Tim Rock at CDPHP that contained information about the PAC–IOs obtained from James O'Higgins. Ex. 2 att'd to Doc. 68, at 71–73. However that letter does not identify James O'Higgins as the source of the information. Ex. A att'd to Culnan Aff., Doc. 46. Oberting admitted as much. Ex. 2 att'd to Doc. 68, at 78. Nothing in the deposition transcript of David Oberting suggests CDPHP learned of the conflict in time to ratify the purchase.

Needless to say, ratification is an affirmative defense for which defendant carries the burden of proof. *E.g., Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1213 (S.D.N.Y.1994), *aff'd,* 57 F.3d 146 (2d Cir. 1995). On motions for summary judgment wherein the plaintiff has demonstrated that no material issues of fact remain for trial on one of his claims, defendant must do more than merely aver the existence of a valid affirmative defense to defeat the motion; he must come forward with evidence showing that there are sufficient factual questions regarding that defense that a trial is needed. *See Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("opponent must do more than simply show that there is some metaphysical doubt as to the material facts"). Defendant O'Higgins could not keep the affidavits currently at issue as hole cards; he was obligated to play them to demonstrate that genuine issues of material fact surround-

ed the proffered ratification defense, requiring the CDPHP's fiduciary duty theory be relegated to trial. If the movant has carried his burden under Rule 56 and there is no triable issue of fact with regards to any affirmative defense, summary adjudication is appropriate. *See generally* 6 James Wm. Moore, Moore's Federal Practice § 56.17[4] (2d ed. 1996).

The information in the affidavits was available to defendant prior to the summary judgment order and should have been disclosed then. Nothing in the discovery materials reflects the facts in the affidavits, thus the court did not overlook any controlling matters. Even if the court were to consider these affidavits though, they do not squarely refute the relevant proposition. In order to create genuine issues of material fact concerning the ratification defense, the Oberting and James O'Higgins affidavits must tend to show that CDPHP knew that their investment adviser bought PAC–IOs from his own brother. This they do not do.

David Oberting affirms that before the March 19 meeting he referred an officer or staff person from CDPHP to James O'Higgins for further information regarding the PAC–IO transaction. Ex. C att'd to Doc. 86, ¶ 3. Therefore, he concludes, "CDPHP was aware of the fact that James O'Higgins had acted as the broker for this investment during the course of this telephone conversation." *Id.* ¶ 5. This affidavit supports the contention that CDPHP knew that James O'Higgins was the broker for the PAC–IO transaction. It does not state that CDPHP knew that James O'Higgins was the brother of Michael O'Higgins.

The affidavit of James O'Higgins is similarly canny. He avers that

> [t]here is no question that during that discussion that the person that I spoke with as a representative of CDPHP was aware of the fact that I had been the broker for my brother with respect to this investment.

Ex. D att'd to Doc. 86, ¶ 5.

They may have been aware that James was Michael's broker, but did they know that James was Michael's brother? This affidavit slyly avoids stating that proposition. That their last names are identical is a frail reed for defendant to lean upon. These affidavits, coy as they are and coming before the court only now, when plaintiffs are moving to certify the partial summary judgment, raise troubling issues of veracity.[2] Even if the court were to consider these affidavits despite that they clearly should have been submitted prior to summary judgment, in these circumstances they are insufficient to create a genuine issue of fact precluding judgment upon CDPHP's breach of fiduciary duty claim.

Now *arguendo*, let us assume that the affidavits are properly submitted at this time *and* that they create an issue of fact regarding whether or not CDPHP had full knowledge of the PAC–IO transaction. Does that then create a triable issue concerning ratification? Ratification has three conjunctive elements: (1) acceptance by the principal of the benefits of the transaction (2) with full knowledge of the relevant facts (3) under circumstances indicating an intention to adopt the unauthorized acts. *Monarch Ins. Co. v. Insurance Corp. of Ireland,* 835 F.2d 32, 36 (2d Cir.1987). Although this court's prior order disposed of the ratification de-

2. Several facts cast doubt on these affidavits. First, neither of the affiants is hostile towards defendant O'Higgins. Oberting is or was his employee and James O'Higgins is his brother. These relations suggest that defendant was not prevented from learning of the alleged pre-March 19 telephone conversation between CDPHP and James O'Higgins until now, but instead probably knew of it before this court's prior opinion. Second, the minutes of the March 19, 1993 meeting of CDPHP's finance committee make no mention of the conflict of interest, despite the fact the PAC–IO transaction is a central topic of discussion. Fin.Comm.Mins., Mar. 19, 1993, at 4.

Third, the contemporaneous notes of Ellen Pierce, then CDPHP's controller, do not reveal any knowledge of the conflict. Ex. A att'd to Pierce Aff., Doc. 49. The transcript she later typed up from these notes also fails to mention that the broker and the investment adviser were brothers. Ex B att'd to *id.* Given CDPHP's obvious interest and concern over the PAC–IO investment, and the apparently unusual step of asking Mr. O'Higgins to attend the meeting to explain the security, it seems unlikely that the fraternal relationship would not have come up had CDPHP learned of it before March 19.

fense based upon CDPHP's ignorance of the conflict, its discussion of the other two elements cast doubt upon whether there was any intent to ratify or acceptance of the benefits. *See* Mem.–Dec. & Ord., Doc. 72, at 44–45. Nevertheless, after summarizing the arguments, this court concluded that factual issues existed in regards to the first and third elements, *id.* at 45, and proceeded to decide the matter on the second element, knowledge. The reconsideration motion compels a reexamination of the circumstances surrounding the transaction, and whether any colorable argument for ratification is made out.

"Ratification may be express, as by spoken or written words, or it may be implied from any act, words, or course of conduct on the part of the principal which reasonably tend to show an intention to ratify" the unauthorized or illegal act. 2 N.Y.Jur.2d Agency § 168 (1979). Ratification can occur by silence. *Merex A.G. v. Fairchild Weston Sys.,* 810 F.Supp. 1356, 1370 (S.D.N.Y.1993), *aff'd,* 29 F.3d 821 (2d Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 737, 130 L.Ed.2d 639 (1995). Or more precisely, the principal's intent to ratify may be "implied from knowledge of the principal coupled with a failure to timely repudiate." *Julien J. Studley, Inc. v. Gulf Oil Corp.,* 282 F.Supp. 748, 752 (S.D.N.Y.1968), *rev'd on other grounds,* 407 F.2d 521 (2d Cir.1969). Repudiation must be within a reasonable time after the principal learns all the facts, and the actual interval depends on the circumstances of the case. 2 N.Y.Jur.2d Agency § 175 (1979). But ratification is not lightly or easily established. The intent "must be clearly established and will not be inferred from doubtful or equivocal acts or language." 57 N.Y.Jur.2d Estoppel, Ratification, and Waiver § 76, at 109 (1986); *accord Holm v. C.M.P. Sheet Metal, Inc.,* 89 A.D.2d 229, 233, 455 N.Y.S.2d 429, 432 (1982). Bearing these principles in mind, the court proceeds to revisit the circumstances surrounding the contact between CDPHP and O'Higgins following the PAC–IO investment.

Again, the PAC–IOs were bought January 26, 1993. CDPHP became aware of the investment when they received a purchase con-firmation slip from the broker, First Albany Corporation, sometime in February. *See* Collins Dep. Tr., Doc. 68, at 43; Ex. H att'd to Iseman Aff., Doc. 61 (confirmation slip); Connolly Dep. Tr. at 10–11 (finance director became aware of purchase in mid-February upon receipt of "buy slip"). Then followed a flurry of phone calls, facsimiles, and letters in early March whereby CDPHP asked questions about the PAC–IOs, as detailed supra. Nothing in that correspondence in the least manifests any intention to ratify the transaction. Indeed, it would be more reasonable to assume that the number of inquiries indicated concern about the PAC–IOs.

Defendant O'Higgins argued in his own summary judgment motion that a statement made by Diane E. Bergman, CDPHP's executive director, at the March 19 meeting of the finance committee established his ratification defense. Defs.' Sum. J. Mem. Law, Doc. 43, at 6–7. According to the committee minutes, "Ms. Bergman informed Mr. O'Higgins that no additional purchases of this type of investment should be made until the Plan receives notification from the Insurance Department that this is an acceptable, admitted asset." Ellen Pierce's handwritten and typewritten notes of this meeting agree that this was the substance of Diane Bergman's statement. Exs. A & B att'd to Pierce Aff., Doc. 49. Others who attended the committee meeting are in accord. *See* Collins Aff., Doc. 48; Bergman Aff., Doc. 50; Conners Aff., Doc. 51. And the deposition of Thomas Collins reported the statement similarly. *See* Collins Dep. Tr., Doc. 68, at 58–59.

O'Higgins argues that Bergman's admonition not to buy more until the PAC–IO was cleared with the state insurance department was an implicit approval of the securities already purchased. Defs.' Sum. J. Mem. Law, Doc. 43, at 7. The court disagrees. Even if it appeared CDPHP's concerns were not aroused prior to that statement, Bergman's injunction not to buy more hardly seems to be an endorsement of what was already bought. When the circumstances are taken into account, as they must be, *see Monarch Ins.,* 835 F.2d at 36, it becomes even more obvious that no ratification occurred by dint of this statement. O'Higgins

was before the committee to explain a suspect investment. CDPHP had already directed a number of questions to David Oberting prior to the meeting. Considering the surrounding facts, it seems patent that CDPHP was not ratifying an investment with full knowledge of the facts surrounding its purchase, but was rather collecting information on an investment about which it entertained serious doubts. At the very least, the statement is equivocal and dubious, thus precluding a finding of ratification. *See Holm,* 455 N.Y.S.2d at 432.

Defendant also relies on the March 29, 1993 Board of Directors meeting to support his ratification defense. Defs.' Sum. J. Mem. Law, Doc. 43, at 7–8. Michael O'Higgins was not present at this meeting—indeed, he had made his intention to resign known the night of the 19th. His absence does not per se preclude a finding of ratification based upon what transpired at the board meeting however. Ratification is concerned with the actual intent of the party against whom it is pled. The related doctrine of estoppel, by contrast, is concerned with what has been expressed to the party pleading that defense. *See generally* 57 N.Y.Jur.2d Estoppel, Ratification, and Waiver § 76 (1986) (comparing ratification and estoppel). But to return to the point, the discussion at the board meeting as reflected in the minutes and Tom Collins' deposition and affidavit do not show any ratification of the PAC–IO transaction. The minutes from the directors' March 29, 1993 meeting contain these passages which defendant finds significant:

> Ms. Connolly stated that Michael O'Higgins had a beginning account value in January of $19.2 million. Unfortunately, one of the securities that was purchased lost approximately $1.0 million. We transferred $1 million into the account. The market value at the end of February was $19.3 million. We were concerned about this investment and had Mr. O'Higgins speak at the Finance Committee Meeting to address that concern.

> Mr. Collins stated that O'Higgins invested in interest-only securities which are high risk. He was banking on interest rates going back up, mainly because of the

Clinton economics. The timing to buy these was premature, and was too risky to suit the Finance Committee. However, these interest only accounts are still paying us 13% return on our investment. We plan to hold onto these investments until the interest rates go up.

Ex. H att'd to Defs.' Notice of Mot., Doc. 42. Defendant points primarily to the last two sentences, but reading them in the context of the above quote yields a more accurate interpretation. O'Higgins contends that CDPHP's intent to hold onto the securities until the rates go up indicates an acceptance of the benefit of the 13% return rate. But it is clear that Connolly and Collins are merely making a factual report to the Board about what had transpired in regards to the PAC–IO so far. Moreover the "benefit" of interest payments must be considered in light of the million dollar loss in value the investment had already suffered. Indeed, the May 24 meeting of the Board makes it even more evident that CDPHP was merely hoping to recoup their investment. *See* Ex. J att'd to *id.* In Collins' words, "[t]his information was given to the Board in an attempt to make the best decision we could concerning a very difficult situation." Collins Aff., Doc. 48, at 2. No unequivocal act of ratification occurred here.

O'Higgins informed Collins he intended to resign the night of March 19, and the resignation was effective the March 31. Collins Dep. Tr., Doc. 68, at 59–61. CDPHP began searching for another adviser to take over the account previously managed by O'Higgins. *Id.* at 62. First Albany was selected in May. May 24, 1993 Board of Directors Mins., Ex. J att'd to Defs.' Notice of Mot., Doc. 42, at 2. At the advice of First Albany, one-half of the PAC–IOs were sold in August 1993 and the other half in September. Collins Aff., Doc. 48, at 2.

No ratification can be implied from the delay in disposing of the PAC–IO investment. CDPHP acted with reasonable diligence in finding an adviser to take over the portfolio left unmanaged by O'Higgins' abrubt resignation. *See Nye v. Blyth Eastman Dillon & Co.,* 588 F.2d 1189, 1198 (8th Cir.1978) (investment owner permitted rea-

sonable time to enable him "to consult counsel, employ another broker and to analyze the market"). After being retained, First Albany promptly produced a report concerning the PAC–IOs in which they recommended that half be sold immediately. July 19, 1993 Fin. Comm. Mins. It appeared that CDPHP was wary of merely dumping the entire investment when it appeared that interest rates might rebound—there was concern that immediately selling the whole investment could be held a failure to mitigate damages. *See id.* Instead, CDPHP chose to follow the advice of their new investment adviser and dispose of the PAC–IOs in a more orderly, deliberate fashion. Reasonable planning, investigation, and deliberation following discovery of an unauthorized act for the purpose of putting affairs in order will not constitute ratification by silence or by acceptance of benefits. *See, e.g., Bingham v. Zolt,* 823 F.Supp. 1126, 1132 (S.D.N.Y.1993) (plaintiff estate did not ratify unauthorized acts of legal and financial advisers when instead of disaffirming tax structure, estate took steps to minimize additional losses), *aff'd,* 66 F.3d 553 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1418, 134 L.Ed.2d 543 (1996); *Bernstein v. Centaur Ins. Co.,* 644 F.Supp. 1361, 1370 (S.D.N.Y. 1986) (three month silence after learning of unauthorized acts during which plaintiff undertook investigation was not ratification).

Finally, the court would be remiss not to point out the most obvious indication that no unequivocal ratification of the PAC–IO transaction was made by CDPHP: defendant Michael O'Higgins admitted none was made. Specifically, he gave the following answers to questions from CDPHP:

> Q. Since the time that the PAC–IO investment was purchased for CDPHP, has any representative of CDPHP said to you, in words or substance, that your purchase of the PAC–IO investment was acceptable to CDPHP?
>
> . . . .
>
> A. No.
>
> Q. Has any representative of CDPHP said to you that in their opinion your purchase of the PAC–IO investment was within the bounds of the investment policy?
>
> A. No.
>
> Q. Has any representative of CDPHP indicated to you that they agreed with your decision to purchase the PAC–IO security?
>
> A. No.

O'Higgins Dep. Tr., Doc. 67, at 384–85.

Needless to say, this is substantial evidence that no ratification was intended or occurred.

Under New York law, acts as equivocal as the ones defendant O'Higgins proffers as ratifying gestures do not present factual issues meriting a trial. *See Chelsea Nat'l Bank v. Lincoln Plaza Towers Assocs.,* 61 N.Y.2d 817, 819, 473 N.Y.S.2d 953, 954, 462 N.E.2d 130, 131 (1984). Thus even assuming the new affidavits of Oberting and James O'Higgins are admissible, credible, and relevant—assumptions that are challenging to support—the ratification defense is insufficient to bar the prior grant of partial summary judgment in favor of plaintiff. The motion for reconsideration is denied. The court proceeds to CDPHP's cross-motion to certify the partial judgment for immediate appeal.

## B. *Rule 54(b) Certification*

■ This court granted summary judgment in favor of plaintiff only upon the second cause of action in the amended complaint, Doc. 29—the fiduciary breach claim. All other claims against defendant O'Higgins and all the claims against defendant Oberting were infused with material factual issues warranting a trial. Plaintiff moves to certify that partial summary adjudication.

Civil Procedure Rule 54(b) provides that

> [w]hen more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Absent such determination and direction partial summary judgment is merely an interlocutory adjudication "subject to revision at any

time before the entry of judgment" deciding the whole suit.

The Second Circuit has set forth three steps for making the certification decision: (1) the action must have multiple claims or parties, (2) at least one claim must have been finally decided within the meaning of 28 U.S.C. § 1291, and (3) there must be no just reason for delay. *See Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1091 (2d Cir.1992). The first two factors of the inquiry are jurisdictional and are reviewed de novo on appeal. *Id.* at 1091–92. As for the third factor, whether there is any just cause for delay is a matter of the district court's discretion and is reviewed only for abuse. *See Curtiss–Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 8, 100 S.Ct. 1460, 1464–65, 64 L.Ed.2d 1 (1980). A party may seek certification by way of motion practice. 6 James Wm. Moore, Moore's Federal Practice ¶ 54.41[3], at 54–218 (2d ed. 1996). Once the certification is made, the partial adjudication is appealable, and the judgment may be executed upon. Routine invocation of the rule is disfavored. *Cullen v. Margiotta*, 811 F.2d 698, 710 (2d Cir.), *cert. denied sub nom. Nassau County Republican Comm. v. Cullen*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). The Second Circuit requires strict compliance with Rule 54(b). *E.g., International Controls Corp. v. Vesco*, 535 F.2d 742, 747 (2d Cir.1976), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978). Not only must the Rule 54(b) determination and direction be expressly recited, an explanation must be given for the court's decision to make the certification. *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 629–30 (2d Cir.1991); *In re Chateaugay Corp.*, 928 F.2d 63, 64 (2d Cir.1991) (per curiam).

Turning to the first factor, it is obvious multiple parties are involved—there are two individual defendants named in the suit and subject to different causes of action. This is sufficient for this Rule 54(b) prerequisite, and there is no necessity to proceed to the question of whether multiple claims for relief are involved. 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2656, at 48–49 (1983). The question of multiple claims is relevant to the wisdom of certifying

the partial summary judgment for immediate appeal however, and the court will move on to address that question.

Whether there are multiple claims depends on how we define the phrase "claim for relief" in the rule. As Professor Wright has observed, "[t]here is no generally accepted test that is used to determine whether more than one claim for relief is before the court." 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 2657, at 61. The occasional case in this circuit suggests all that is needed is a multiplicity of numbered legal causes of action in the complaint. *See, e.g., Ginett*, 962 F.2d at 1092. This approach is attractive because it concentrates substantive Rule 54(b) analysis in the discretionary third factor, leaving to the first two jurisdictional inquiries only the ministerial task of counting defendants, plaintiffs, and causes in the complaint. *See generally* 6 Moore ¶ 54.33[2], at 152–53 (language in *Sears v. Mackey* supports this interpretation).

Whatever the merits of that process, less ambiguous cases have treated the claim multiplicity question as requiring inspection of the factual relatedness of the different theories of recovery:

> In *Gottesman v. General Motors Corp.*, 401 F.2d 510, 512 (2d Cir.1968), we defined the word "claim" in the context of Rule 54(b) as "the aggregate of operative facts which give rise to a right enforceable in the courts." (quoting *Original Ballet Russe v. Ballet Theatre*, 133 F.2d 187, 189 (2d Cir.1943)).

*Hudson River Sloop Clearwater v. Dep't of Navy*, 891 F.2d 414, 418 (2d Cir.1989).

The *Gottesman* decision also quoted *McNellis v. Merchants Nat'l Bank & Trust Co. of Syracuse*, 385 F.2d 916 (2d Cir.1967) for the above definition. Judge Port, formerly of this district, had certified a partial summary judgment for immediate appeal in *McNellis*. *Id.* at 918. The Second Circuit dismissed the appeal, holding that "although the complaint stated two 'causes of action,' there was but one 'claim for relief' under the federal rules." *Id. See also State of New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1424 (2d Cir. 1991) (court "must examine ... the relation-

ship between plaintiffs' claims to determine whether they are sufficiently separate and distinct as to lend themselves to review as single units, or whether they are so interrelated and dependent upon each other as to be one indivisible whole.").

This court is of the opinion that the fiduciary duty claim is sufficiently separable from plaintiff's contract, securities fraud, and other theories that it is an individual claim for relief within Rule 54(b)'s meaning. The aggregate of facts required to prove the fiduciary breach cause are different than those required to prove breach of contract, for example. As this court observed in its summary judgment order, Doc. 72 at 47, victory on the contract claim requires a finding that CDPHP's investment policy was incorporated into the investment management agreement. The factfinder also must answer the question of whether the PAC–IO conformed to the investment policy. Neither of these inquiries is necessary to the finding that O'Higgins breached his fiduciary duty to CDPHP. As for plaintiff's antifraud theories, both Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 require proof of scienter. *Id.* at 47–48. But bad intent is not a predicate to a fiduciary breach in this case: "Even assuming the best intentions on O'Higgins' part, he is still required to disclose any and all conflicts of interest." *Id.* at 29. The court is satisfied that the claim CDPHP seeks to certify is separate and distinct from those questions remaining for trial. *See Hudson River Sloop Clearwater,* 891 F.2d at 418.

We briefly touch on defendant's objections to the claim multiplicity issue. O'Higgins cites several out-of-circuit cases for the proposition that "[c]laims cannot be separate unless separate recovery is possible on each." Def.'s Mem.Law, Doc. 85 at 3 (citing *Local P–171, Amalgamated Meat Cutters v. Thompson Farms Co.,* 642 F.2d 1065, 1070–71 (7th Cir.1981)). Assuming the truth of that assertion, defendant apparently is overlooking plaintiff's demand for investment advisory fees, which are not an element of the damages for the fiduciary breach. They might be recoverable if CDPHP was successful on its contract claim however. Moreover,

codefendant Oberting is a joint and several tortfeasor on several causes of action; if the fiduciary breach summary judgment proves uncollectible against O'Higgins, then CDPHP could attempt to execute against Oberting, if the health plan is successful on the fiduciary duty or securities law claims lodged against the codefendant. In any event, it is clear that the damages attributable to O'Higgins' breach of fiduciary duty are not the only ones potentially recoverable by plaintiff in this matter.

The second requirement for Rule 54(b) certification is that the certified claim must be finally decided within the meaning of 28 U.S.C. § 1291. Final decisions are those that "end[ ] the litigation on the merits and leave[ ] nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (quoted case omitted). Defendant objects that the issue of prejudgment interest, requested by the plaintiff for the first time in its motion for certification, has not been decided thus precluding entry of judgment. The point is valid and is addressed below.

The third factor—whether there is no just cause for delay—is decided by the district court's balancing of "judicial administrative interests as well as the equities involved." *Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980). This court's role is one of a "dispatcher," determining when the appropriate time for letting a final decision proceed to execution or appeal has come. *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 435, 76 S.Ct. 895, 899–900, 100 L.Ed. 1297 (1956). Having performed the analysis, the court has found several equities and administrative concerns that warrant the certification.

Plaintiff now has a substantial judgment in its favor, and failure to certify could result in profound delay in the receipt of relief. The same concern supported the Rule 54(b) certification in the *Curtiss–Wright* case. 446 U.S. at 11, 100 S.Ct. at 1466–67. Moreover, if this court's grant of summary judgment is sustained on appeal, trial may be avoided altogether. The damages attributable to the fiduciary breach, without prejudgment inter-

est, are approximately $1.86 million. The other damages CDPHP seeks in its complaint—the investment advisory fees—amount to about $120,000. While this amount is not insubstantial by any measure, trial on the remaining claims may be expensive due to the necessity of expert financial testimony, and an out-of-court resolution of the fees consequently may be facilitated if plaintiffs can recover the damages for the breach of fiduciary duty. Judicial economy would thus be served.

If the remaining issues do ultimately proceed to trial, sound judicial administration is still advanced. If CDPHP is successful on the appeal of a certified summary judgment, then the trial may be much simplified and shortened. Many witnesses pertinent to the issue of ratification may not be called. The court will be left primarily with the issues of the interpretation of the investment advisory agreement and the investment policy and the classification of the PAC–IO security. Testimony would not be muddied with the question of "who knew what when."

Plaintiff has also proffered as a sound reason for certification the fact that defendant O'Higgins has moved to Florida. CDPHP is concerned that with the passage of time the judgment will become increasingly uncollectible, due in part to Florida's generous debtor protection laws. In support of this argument, plaintiff cites a Seventh Circuit case wherein a Rule 54(b) certification was upheld based on the district court's determination that the defendant's "precarious financial position" might jeopardize collection. *Bank of Lincolnwood v. Federal Leasing, Inc.*, 622 F.2d 944, 949 (7th Cir.1980); *id.* at 951. Although the court does not wish to overstate the case, it is true that O'Higgins' relocation to Florida may make execution more difficult. Further delay can only exacerbate the problem.

In sum, the equities and administrative considerations counsel for expedition of the appeal. The fiduciary duty question is distinct from the other claims asserted by plaintiff, and its early resolution will contribute to the efficient disposition of the entire case. The court consequently holds that there is no just reason to delay the entry of final judgment on the fiduciary duty claim. Because this court is granting the Rule 54(b) certification and the judgment will be subject to execution in accordance with applicable procedural rules, the motion for injunctive relief to preclude the alienation of assets against which the judgment may be satisfied is denied. All that is left is the question of prejudgment interest.

## C. Prejudgment Interest

■ In this court's prior opinion granting partial summary judgment, the formula for computation of the damages attributable to O'Higgins' breach of fiduciary duty was described as "the difference between the cost of the investment and its final sale price, minus any interest payments the PAC–IOs made." Doc. 72 at 42. There appears to be no dispute that the damages principal amounts to $1,863,553.05. Connolly Aff., Doc. 76. Plaintiff however also seeks simple interest at the New York statutory rate of 9 percent. That figure is accruing at the rate of $459.51 a day, and through the last day of 1996 totalled $806,740.24.

Even in a suit premised on federal question jurisdiction, the decision whether to award prejudgment interest on pendent state law claims is governed by state law. *E.g., Strobl v. New York Mercantile Exch.*, 590 F.Supp. 875, 881 (S.D.N.Y.1984) (MacMahon, J.), *aff'd,* 768 F.2d 22 (2d Cir.), *cert. denied sub nom. Simplot v. Strobl,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985). On this issue, New York law provides that

> [i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be at the court's discretion.

N.Y.C.P.L.R. 5001(a) (McKinney Supp.1997).

Thus in contrast to federal law which leaves all questions of prejudgment interest to the court's discretion, New York law mandates the award when the action lies at law. *Hi-*

lord Chem. Corp. v. Ricoh Elecs., Inc., 875 F.2d 32, 39 (2d Cir.1989).

The consensus of federal courts interpreting New York law is that actions for breach of fiduciary duty fall in the category for which prejudgment interest is a matter of right. In one case from the Southern District of New York, the defendant Citibank was acting as an investment adviser and fiduciary agent to a plaintiff named Gajria. *Quintel Corp. v. Citibank,* 606 F.Supp. 898 (S.D.N.Y.1985). Gajria obtained a jury verdict against Citibank for breach of fiduciary duty. Judge Sweet held that Gajria was entitled to prejudgment interest on this claim. *Id.* at 914. He also concluded that such interest had to be calculated at the New York statutory rate. *Id.* at 915 (applying N.Y.C.P.L.R. 5004). As another court has noted

> The proposition that prejudgment interest is customarily awarded to compensate a plaintiff for damages due to the loss of the use of money in cases involving breach of fiduciary duty does indeed find ample precedent.

*McCoy v. Goldberg,* 810 F.Supp. 539, 546 (S.D.N.Y.1993).

*See also* cases cited at *id.; Spector v. Mermelstein,* 485 F.2d 474, 482 n. 8 (2d Cir.1973) (suggesting fiduciary duty claims seeking damages as relief are classified as actions at law for which prejudgment interest is mandated).

The statutory rate is nine percent. N.Y.C.P.L.R. 5004. Simple interest, rather than compound, is the rule. *E.g., Long Playing Sessions, Inc. v. Deluxe Labs., Inc.,* 129 A.D.2d 539, 540, 514 N.Y.S.2d 737, 738 (1987). As for when interest runs from, section 5001(b) governs that consideration:

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

CDPHP has included with their Rule 54(b) memorandum a loss computation chart that meets the requirements of this section, current through September 18, 1996 (the computation is appended to this opinion). Prejudgment interest will therefore be awarded as calculated therein, with an additional $459.51 per day between September 18, 1996 and the date of this opinion.

## III. CONCLUSION

Defendant Michael O'Higgins' motion for reconsideration is DENIED. Plaintiff CDPHP's motion for a preliminary injunction is also DENIED. The plaintiff's motion for Rule 54(b) certification of this court's prior grant of summary judgment upon the second cause of action in the amended complaint— that is, the claim that O'Higgins breached his fiduciary duty to CDPHP—is GRANTED.

Pursuant to Federal Rule of Civil Procedure 54(b) this court expressly DIRECTS the entry of final judgment upon the second cause of action in the amended complaint, decided in this court's previous partial summary judgment order, Doc. 72. The court expressly DETERMINES that there is no just reason to delay the entry of judgment as explained in Part II.B supra.

The clerk of the court is ORDERED to enter judgment in favor of plaintiff CDPHP and against defendant Michael O'Higgins in the amount of $2,677,645.45. This amount consists of $1,863,553.05 in damages and $814,092.40 in prejudgment interest.

It is So Ordered.

CDPHP Loss Computation for PAC–IO Purchase & Sale

Date of Computation: 9/18/96

| Date | Event | Amount | Per Diem * | "As Of" Date | No. of Days | Interest | Total |
|---|---|---|---|---|---|---|---|
| 2/2/93 | Purchase | − $5,139,222.37 | − $1267.21 | 9/18/96 | 1324 | − $1,677,780.10 | − $6,817,002.47 |
| 2/2/93 | Accrued Interest | − $4,503.73 | − $1.11 | 9/18/96 | 1324 | − $1,470.31 | − $5,974.04 |
| 3/19/93 | Correction | $5,139,222.37 | $1267.21 | 9/18/96 | 1279 | $1,620,755.85 | $6,759,978.22 |
| 3/19/93 | Correction | $4,503.73 | $1.11 | 9/18/96 | 1279 | $1,420.34 | $5,924.07 |
| 3/19/93 | Purchase | − $5,074,411.39 | − $1251.22 | 9/18/96 | 1279 | − $1,600,816.42 | − $6,674,727.81 |
| 3/19/93 | Accrued Interest | − $4,446.82 | − $1.10 | 9/18/96 | 1279 | − $1,402.39 | − $5,849.21 |

| Date | Event | Amount | Per Diem * | "As Of" Date | No. of Days | Interest | Total |
|------|-------|--------|------------|--------------|-------------|----------|-------|
| 3/25/93 | Paydown | $135,633.42 | $33.44 | 9/18/96 | 1273 | $42,574.03 | $178,207.45 |
| 4/26/93 | Paydown | $133,932.06 | $33.02 | 9/18/96 | 1241 | $40,983.21 | $174,915.27 |
| 5/25/93 | Paydown | $132,222.03 | $32.60 | 9/18/96 | 1212 | $39,514.46 | $171,736.49 |
| 6/25/93 | Paydown | $130,503.34 | $32.18 | 9/18/96 | 1181 | $38,003.29 | $168,506.63 |
| 7/26/93 | Paydown | $128,776.06 | $31.75 | 9/18/96 | 1150 | $36,515.95 | $165,292.01 |
| 8/4/93 | Sale | $1,320,862.79 | $325.69 | 9/18/96 | 1141 | $371,614.79 | $1,692,477.58 |
| 8/4/93 | Accrued Interest | $6,269.89 | $1.55 | 9/18/96 | 1141 | $1,763.99 | $8,033.88 |
| 8/25/93 | Paydown | $127,040.23 | $31.32 | 9/18/96 | 1120 | $35,083.99 | $162,124.22 |
| 9/21/93 | Correction of Sale | −$1,320,862.79 | −$325.69 | 9/18/96 | 1093 | −$355,981.57 | −$1,676,844.36 |
| 9/21/93 | Correction of Interest | −$6,269.89 | −$1.55 | 9/18/96 | 1093 | −$1,689.78 | −$7,959.67 |
| 9/21/93 | Sale | $1,302,280.93 | $321.11 | 9/18/96 | 1093 | $350,973.63 | $1,653,254.56 |
| 9/21/93 | Accrued Interest | $6,181.66 | $1.52 | 9/18/96 | 1093 | $1,666.00 | $7,847.66 |
| 9/30/93 | Sale | $1,054,988.46 | $260.13 | 9/18/96 | 1084 | $281,985.41 | $1,336,973.87 |
| 10/13/93 | Paydown | $63,746.97 | $15.72 | 9/18/96 | 1071 | $16,834.44 | $80,581.41 |
| Total | | −$1,863,553.05 | −$459.51 | | | −$758,951.20 | −$2,622,504.25 |

\* Computed at 9% simple interest per year divided by 365 days per year